IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 17–cv–00977–KMT


ANTHONY J. SMITH,

     Plaintiff,

v.

BNSF RAILWAY COMPANY, a Delaware corporation,

     Defendant.

---

## ORDER

---

     This matter is before the court on "BNSF Railway Company's Motion for Summary Judgment on Plaintiff's FELA and FRSA Claims" ("Mot.") [Doc. No. 48] filed November 16, 2018. "Plaintiff's Response in Opposition to BNSF Railway Company's Motion for Summary Judgment on Plaintiff's FELA and FRSA Claims" ("Resp.") [Doc. No. 56] was filed December 11, 2018. "BNSF Railway Company's Reply in Support of its Motion for Summary Judgment on Plaintiff's FELA and FRSA Claims" ("Reply") [Doc. No. 59] was filed on December 26, 2018. This motion is now ripe for ruling by the court.[1]

---

[1] BNSF's motion for leave to file a supplemental brief [Doc. No. 69, filed April 5, 2019] was denied on June 12, 2019. [Doc. No. 72.]

Unless otherwise referenced, the following summary is taken from the parties' undisputed facts ("UF") contained in BNSF's motion, which were not disputed in the Response by Plaintiff.

Plaintiff Smith began working for BNSF in November 2014 as a Carman, a job that entails working on rail cars needing repairs, as well as inspecting rail cars, connecting air hoses, and releasing hand brakes. (UF #1.) The Carman position entailed specialized safety training (UF # 2, 4) and working as an apprentice under more experienced Carman employees (UF# 3).

On or about May 23, 2015, Plaintiff worked for BNSF at the yard and was releasing rail car hand brakes with Greg Rogers, Morris Bell and George Keithline. (UF #39.) Plaintiff made no report of injury for any activities he undertook on that day. (UF # 17.) Between May and July 22, 2015, Plaintiff did not miss work because of any injury sustained on his job as Carman. (*Id*.) Plaintiff Smith denies that he was injured prior to the July 22, 2015 injury described *infra*.

On June 26, 2015, Plaintiff began seeing a chiropractor, Dr. Stephen Kutscher, complaining that he had been feeling pain and tingling from his right shoulder to his fingers since June 1, 2015, and reported his symptom level as being near the top of "extreme symptoms." (Mot., Ex. H [Doc. No. 48–8].) On the body diagram Plaintiff completed at intake, Plaintiff said he was feeling "pins & needels (sic)" from his thumb to the top of his neck and used the pain assessments for Ache, Burning, Numbness and Pins and Needles as descriptive of his symptoms. (*Id*.) He claimed that any movement or pressure aggravated the problem and that he was prevented from doing or enjoying "Everything sleep." (*Id*.) Between June 26, 2015 and July 21, 2015, Plaintiff was treated by Dr. Kutscher more than once.

On July 22, 2015, Plaintiff, working with more senior employees Carman Aranda and Carman Acosta at the rip track (not at the yard) (*see* UF#56), was using a sledge hammer to attempt to remove[2] a cushioning unit from a rail car. (UF #21, 23–25.) Plaintiff was not swinging the sledge hammer in a traditional movement, but rather was using it "in a plunger effect to tap the cushioning unit" (UF #25) and "not holding any weight of the sledgehammer" (UF #24). During the last hour of his shift, while still engaging with the sledge hammer and the cushioning unit, Plaintiff testified that he felt a "zinger" or "Charlie horse" shoot up his right arm. (Resp. Ex. 1 at 34 [Doc. No. 56–1] ("Pl. Dep."), deposition page 130.) The trio were unable to release the cushioning unit during the course of their shift that day and left the project to be worked on by others. (UF #35.) No report of injury was made that day.

Although the date Plaintiff claims he first reported an injury to BNSF arising out of his activities on July 22, 2015 is disputed – it appears the date was either July 24 or July 25, 2015 – it is undisputed that on July 27, 2015, Smith submitted an injury report that his supervisor helped him complete[3] and noted the date of injury as July 22, 2015. (UF ## 37, 39; [Doc. No. 48–16].) In describing his injuries, Plaintiff stated in the report, "sever (sic) pain from right shoulder blade to finger tips, numbness, pins & needles sensation." [Doc. No. 48–16.] Plaintiff also stated, "was noticing irritation on east and trainyard tying hand brakes, final realization was at rip track using sledge hammer on track 123 working on [unreadable] gear." (*Id*.) Plaintiff reported that fellow employees Greg Rogers, Morris Bell, and George Keithline were witnesses to his injury;

---

[2] Defendant contends that Plaintiff was not, at that time, trying to "remove" the cushioning unit, but was merely testing to see if the cushioning unit connection was "tight in the sill pocket." (Mot. at 32.)
[3] BNSF Nelson came to Plaintiff's home to help him with the injury report. (Pl. Dep. at 149-151.)

Plaintiff did not report that Mr. Aranda or Mr. Acosta were witnesses.  (*Id*.; UF #39.)  As noted, Mr. Rogers, Mr. Bell and Mr. Keithline were employees who worked with Plaintiff on or about May 23, 2015, when Plaintiff was releasing hand brakes on rail cars at the yard but who were not working with him on July 22, 2105.  (UF #39.)

On July 23, 2019, before any injury report was made to any person in authority at BNSF, Plaintiff went to see Dr. Brad Reedy, D.O., at Front Range Family Medicine.  [Doc. No. 48–17.] According to Dr. Reedy's intake notes, Plaintiff reported neck pain, upper back pain and shoulder pain, which Plaintiff said had been ongoing for 8–9 weeks and had been worsening for the previous two weeks.  Plaintiff claimed that the pain was "[w]orse after swinging sledge hammer at work."  (*Id*. at 1.)

Plaintiff has been diagnosed via an MRI taken August 12, 2015, with

1. Mild degenerative changes of the C6–7 disc space with a posterior right paracentral disc protrusion/herniation causing lateral recess effacement and proximal C7 nerve root compression. 2. Minimal degenerative changes of the C7–T1 disc space with a small posterior central disc protrusion without evidence of nerve root impingement or cord compression. 3. Findings consistent with muscle spasm.

(Resp., Ex. 6 [Doc. No. 56–6] (MRI Radiological Report); *see also* Ex. 5 [Doc No. 56–5] (Operative Report).)

After conducting two disciplinary investigations concerning Plaintiff's Report of Injury, on September 2, 2015, BNSF terminated Plaintiff based on its finding of "dishonesty."  (UF #50, 54.)  Plaintiff also received a Level S record suspension on the basis that Plaintiff failed to file a FRSA report about a May 2015 injury.  (*Id*.)

Plaintiff claims that he was fired because he filed an injury report, a FRSA protected activity and that not only was he not dishonest, the dishonesty allegation is a pretext for the real

reason he was fired – for engaging in protected activity. Further, Plaintiff claims that BNSF provided an unsafe work environment which led to his injury on July 22, 2015. Defendant moves for judgment as a matter of law on both claims.

### *LEGAL STANDARD*

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. P. 56(c). A disputed fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Thomas v. Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (citing *Anderson*, 477 U.S. at 248).

When ruling on a motion for summary judgment, a court may consider only admissible evidence. *See Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1209–10 (10th Cir. 2010). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the

party opposing summary judgment. *Concrete Works*, 36 F.3d at 1517. When ruling on a motion for summary judgment, courts should recall that "[c]redibility determinations [and] the weight of the evidence" are the province of the jury. *Fresquez v. BNSF Railway Co.*, No. 17–cv–00844–WYD–SKC, 2018 WL 6249686, at *5 (D. Colo. Oct. 2, 2018) (citing *Anderson*, 477 U.S. at 255). Even so, at the summary judgment stage of litigation, a plaintiff's version of the facts must find support in the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson*, 584 F.3d at 1312.

### *ANALYSIS*

### A.     *Federal Railroad Safety Act – Claim II*

In 1980 Congress added an anti-retaliation provision to the Federal Railroad Safety Act, 49 U.S.C. § 20101, *et seq*. ("FRSA"), prohibiting railroad carriers from discriminating against employees who reported safety violations or who refused to work under hazardous conditions. Federal Railroad Safety Authorization Act of 1980, Pub. L. No. 96–423, § 10, 94 Stat. 1811, 1815. FRSA provides that a railroad "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee." 49 U.S.C. § 20109(a)(4).

To prevail on his FRSA claims, Plaintiff must prove each of the following four elements by a preponderance of the evidence: 1) he engaged in protected activity; 2) BNSF knew about the protected activity; 3) BNSF subjected him to an unfavorable personnel action; and 4) the protected activity was a "contributing factor" in the unfavorable personnel action. *BNSF Ry. Co. v. United States DOL*, 816 F.3d 628, 638 (10th Cir. 2016); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014). Courts have held that an employee must prove intentional retaliation prompted by the employee engaging in protected activity. *See Jones v. BNSF Ry. Co.,* No. 14–2616–JAR–KGG, 2016 WL 3671233, at *3 (D. Kan. July 11, 2016) (district court correctly focused on the decisionmakers' knowledge and motive when analyzing Appellant's FRSA retaliation claims). The Supreme Court has held that the essence of the kind of intentional tort involved here is "discriminatory animus." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) (dealing with antimilitary animus).

If Plaintiff can establish a *prima facie* case as to the first four elements of his FRSA claim, a defendant such as BNSF can nonetheless be exonerated from liability if it "demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of the plaintiff's protected activity." *See* 49 U.S.C. § 42121(b)(2)(B)(ii); *Fresquez*, 2018 WL 6249686, at *10–11 (If the employee meets his or her threshold burden, the burden shifts to the employer to demonstrate "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected activity].") (citing *Lincoln v. BNSF Ry. Co*., 900 F.3d 1166, 1212 (10th Cir. 2018) (quoting *Conrad v. CSX Transp., Inc.,* 824 F.3d 103, 10 (4th Cir. 2016)). In *Araujo v. New Jersey Transit Rail Operations, Inc.,* 708 F.3d 152 (3d Cir. 2013), the

court made clear that this is a "tough standard, and not by accident." *Id.* at 159 (citation omitted). "[T]he "standard is 'tough' because Congress intended for companies . . . to face a difficult time defending themselves, due to a history of whistleblower harassment and retaliation in the industry." *Id.* (citation omitted).

Defendant claims Plaintiff lacks evidence sufficient to support elements one and four. As to element two, it is not disputed that BNSF knew about Plaintiff's injury report [4] and as to element three, both termination and suspension are undisputedly adverse employment events.[5] Should the court find, however, that sufficient evidence does exist to support Plaintiff's FRSA claim, Defendant argues it is nonetheless entitled to judgment as a matter of law on its affirmative defense that BNSF would have suspended and terminated Plaintiff notwithstanding the protected activity of filing an injury report on the basis of Plaintiff's dishonesty. Finally, BNSF argues that even if the court finds sufficient evidence on elements one through four and finds against BNSF at this stage on its affirmative defense, Plaintiff lacks sufficient evidence to pursue a claim for punitive damages.

### 1. **Element 1, Protected Activity**

Defendant argues, relying on *Murphy v. Norfolk S. Ry. Co.*, No. 1:13–CV–863, 2015 WL 914922, at *5 n.3 (S.D. Ohio Mar. 3, 2015)[6], that Plaintiff did not make a good faith injury report in July 2015. To satisfy the "good faith" requirement under FRSA, an employee must both

---

[4] Foreman Nelson, a supervisor with BNSF, actually drove to Plaintiff's home a few days after Plaintiff's verbal advisement of his July 22, 2015 claimed injury and helped him fill out the injury report. [Doc. No. 48-16.]

[5] There is no dispute that Plaintiff was disciplined subsequent to the filing of his injury report to include termination. (UF #58.)

[6] Throughout its briefs, Defendant uses LEXIS citations. This court's Practice Standards require all cases to be cited using Westlaw. *See* Practice Standards (Civil Cases), § II.D.2.

"have a good faith belief that his injury is work-related" and "have actually made the injury report itself in good faith." *Id.* The Ohio court addressed a situation where an employee had attempted to conceal his injury from his employer by failing to make an injury report. Defendant argues that Plaintiff's failure to report his May 2015 injury, like the Plaintiff in *Murphy*, was an attempt to conceal the same. In the Ohio case the court found that an employee who later reports an on-duty injury after actively attempting to conceal his injury from his employer does not make a "good faith" injury report under FRSA. Accordingly, "[a]n employee who . . . actually attempted to avoid reporting an injury. . . would not be acting in good faith." *Id.* As applied to this case, Defendant argues that if there was no "real" report of injury, to wit: there was no injury on July 22, 2015 because the injury happened at an earlier time, there would be a failure of a "good faith" injury report, no "protected activity," and therefore no viable claim under FRSA. (Mot. at 16.)

Defendant, in seeking summary judgment, argues that Plaintiff, given the undisputed evidence now before the court, cannot meet his burden under FRSA, in part, because of a lack of "good faith protected activity," an essential element of a FRSA claim. Defendant argues that the evidence shows that "Smith concealed a May handbrake incident from BNSF for two months and, in doing so, violated BNSF's reporting rules" (Mot. at 17) and "attempted to avoid reporting an injury" (*id.* at 18).

Without a doubt, the primary dispute in this case is whether Plaintiff suffered a work-related injury in May 2015 or in July 2015 or both or neither.

Contrary to the arguments of Defendant, credible admissible evidence exists supporting a theory that Plaintiff did <u>not</u> suffer spinal injury until July 22, 2015. BNSF policy is to allow the

employee to determine, in the first instance, whether he has been injured on the job. (Resp., Ex. 19 at 4 [Doc. No. 56–19] (Dep. of Bret J. Bridges), deposition page 94 (referencing Dep. Ex. 23, BNSF Injury Reporting Policy).) Plaintiff testified that he felt very sore from his unaccustomed activities on or about May 23, 2015, but felt it was simply from unaccustomed physical labor. (Pl. Dep. at 143–144, 248–250.) Plaintiff did not did not take any time off complaining of pain between May and July 22, 2015 and did not file an injury report. Plaintiff testified that he went to the chiropractor several weeks after the day of hand brake work to simply utilize the benefits of chiropractic adjustment which were offered by the company as a matter of course to help with what he believed was muscle soreness which had largely resolved by late June 2015.[7] (Pl. Dep. at 132, 148.) Plaintiff also testified that the events on July 22, 2015 created a unique, new pain experience as well as exacerbated his existing pain significantly. It is undisputed that Plaintiff sought immediate emergency medical attention from his primary care doctor – not his chiropractor – the day after the work events on July 22, 2015. (Pl. Depo., Ex. 4.) The doctor, after seeing Plaintiff, scheduled an MRI. (Pl. Depo. at 140.) Plaintiff testified that he could not move his arm, "I was like I was paralyzed." (*Id*. at 171.) Also, Plaintiff immediately sought time off from his next scheduled work day to deal with the injury. Plaintiff notified his supervisor he was unable to work because of an injury, provided his supervisors with a "doctor's

---

[7] It is unclear from the record whether Plaintiff viewed his visits to the chiropractor as seeking medical treatment. Thus, the court cannot say this is an undisputed fact. Nevertheless, the court finds that Plaintiff's chiropractor visits in June and early July of 2015 do not alone satisfy the criteria of an "[i]njury to any person that results in: (i) Medical treatment." 49 C.F.R. § 225.19(d)(2)(i). On the other hand, Plaintiff's July 23, 2015 visit to Dr. Reedy immediately following his alleged injury involving the cushioning unit does create a "reportable railroad accident[ ]/incident[ ]." *Id*. at 225.19(a).

note" and filed an injury report with the help of one of his supervisors within a few days of the July 22, 2015 activities. (Mot., Ex. F; Ex., Dep. of Bret J. Bridges at 56, Dep. Ex. 16.)

The court does not discount that there is also credible admissible evidence to support a theory that Plaintiff injured his back when he was tying down rail car hand brakes on or about May 23, 2015. Plaintiff himself told the chiropractor in June, long before the July 22, 2015 "zinger," that he "might have" been injured at work in late May when he was tying down or setting rail car hand brakes. He set forth exactly the same pain symptoms in his June 26, 2015 chiropractor visit as he did when he saw Dr. Reedy on July 23, 2015, one day after the July 22, 2015 sledge hammer work on the stuck cushioning unit. In fact, Plaintiff told Dr. Reedy that he had been suffering from back pain for eight to nine weeks prior to July 22, 2015, which had gotten worse in the two weeks before the activities on July 22, 2015.

The evidence regarding whether there was a work-related injury in May, 2015 or July 22, 2015, could support either side's conclusions, thus creating a quintessential jury question. The issue will be largely one of credibility and viewing the evidence as a whole. BNSF claims that Plaintiff told several different stories about his injury[8] and either broke BNSF rules by not reporting the May 2015 injury and/or filed a false report of injury in July 2015. Plaintiff claims simply that if he was injured at all in May 2015, which he denies, it was simply part of a series of events which may or may not have been related to the "zing" or "charlie horse" he experienced when attempting to dislodge the cushioning unit by using the sledge hammer on July 22, 2015.

---

[8] The evidence presented to the court at this point does not show that Plaintiff "told several different stories." In fact the evidence before the court at this stage shows that Plaintiff constantly and consistently maintained that he was not injured in May of 2015 and that the injury he reported happened on July 23, 2015.

The court finds that neither of the differing inferences and conclusions drawn from these facts by the two sides are incredible as a matter of law. At the summary judgment stage, the trial judge's function is not to weigh the evidence and decide what occurred, but to determine whether a genuine issue exists for the jury. *Anderson v. Liberty Lobby, Inc.*, at 249; *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253 (1968). Here, it does.

## 2.     Element 4, Contributing Factor

The Tenth Circuit has stated that a "contributing factor" is "any factor, which alone or in combination with other factors, tends to affect *in any way* the outcome of the decision." *BNSF v. DOL*, 816 F.3d at 638 (citing *Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor,* 717 F.3d 1121, 1136 (10th Cir.2013) (emphasis in original)). The Circuit Court stated,

> Ordinarily, to meet this standard, an employee need only show "by preponderant evidence that the fact of, or the content of, the protected disclosure was one of the factors that tended to affect in any way the personnel action." In other words, even if the personnel action resulted not simply from the protected activity itself (filing a report), but also from the content declared in the protected activity, the two parts are "inextricably intertwined with the investigation," meaning the protected activity was a contributing factor to the personnel action. So if the employer would not have taken the adverse action without the protected activity, the employee's protected activity satisfies the contributing-factor standard.

*Id*. at 639 (internal citation omitted).

Here, the evidence showed the Plaintiff filed an injury report that was consistent with his outward, objective actions. After describing his "Injuries or Illness," when asked to "Describe fully how injury, illness or condition occurred" he stated,

> Was noticing irritation on east end train yard tying hand brakes, final realization was a rip track using sledge hammer on track 123 working on draft gear.

[Doc. No. 46–16.] The question did not ask for relevant dates, but the response clearly indicated an injury over time, not one discrete incident, as it occurred in two different locations where

Plaintiff worked at least a month apart.  As previously noted, a few weeks after the May 23, 2015 hand brake tying at the train yard, Plaintiff sought treatment from a chiropractor, whom he saw several times before the incident at the rip track.  Plaintiff did not take any time off related to injury after the May 23, 2015 events.  On July 22, 2015, Plaintiff stated he suffered a sharp pain which he called a "zinger."  The next morning, he awoke to intensified pain and immediately sought medical treatment, called his supervisor to report an injury that was going to keep him out of work, and met with another BNSF employee to help him fill out an injury report.

Considering these facts as they were known on July 27, 2015, there was no indication that Plaintiff was engaging in any subterfuge whatsoever with respect to the reported injury sequence of events.  The July 27, 2015 injury report references Plaintiff's May 2015 work events and physical symptoms associated therewith, thus perhaps revealing a rule violation for Plaintiff's failure to report a May 2015 work injury,[9] but it does not intrinsically suggest dishonesty.  Plaintiff does not hide the May 2015 events and that he started experiencing discomfort then.

Additionally, according to BNSF General Foreman II Nelson, prior to reporting his July 22, 2015 injury, Plaintiff was never observed performing a task unsafely and Foreman II Nelson was aware of no issues concerning Plaintiff as an employee.  (Resp, Ex. 8, at 24.)  BNSF CMO Mabry, the ultimate decision maker regarding Smith's discipline, testified that in his opinion

---

[9] BNSF employees cannot immunize themselves against wrongdoing by disclosing it in a protected-activity report.  816 F.3d at 639.  *See also McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362 (1995) ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, [the court] cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.").

Smith sustained an injury in May 2015 and violated rules in not reporting the injury but then admitted that "it's very blurry as to what point the personal injury happened . . ." and simply that he doesn't "know where this injury happened." (Resp., Ex. 20, at 42 and 46.)

In spite of all this, BNSF claims that it had "reasons" to believe that Plaintiff was dishonest in his report of injury made July 27, 2015. (Mot. at 20.) However, the "reasons" seem to be the characterization of Plaintiff's explanations for behavior learned during the investigations, not the injury report itself.

In this case, rather than simply accepting that its employee was hurt on the job and acknowledging, at least at first, that the work on the stuck cushioning unit was, at the minimum, the "final straw" requiring the employee to acknowledge an injury for which he would have to report, BNSF almost immediately initiated two investigations of Plaintiff and his injuries and ultimately terminated his employment for "dishonesty" with respect to his injury report.[10] Defendant confirms that Plaintiff was "disciplined for multiple inconsistencies that were uncovered in his injury report, including falsifying an injury report because he reported two injuries, and then denied one of the injuries that he had reported." (Mot. at 12, ¶ 59.) He was not terminated for a rule violation. (See Mabry Dep. 47:1–19 (Mr. Mabry believed that the multiple different accounts demonstrate that Smith was dishonest in his injury report, and this supported his dismissal decision.).)

---

[10] While it is certainly BNSF's right to reach its own conclusions derived from its own investigation, such credibility determinations are not the prerogative of this court at the summary judgment stage.

To the extent Plaintiff prevails on the first element addressed *supra*, and the July 27, 2015 injury report is found to be protected activity, there can be no real dispute that Plaintiff's filing the injury report "contributed to" his termination and suspension.

It is not necessary in an FRSA retaliation case that the plaintiff show that the decision-maker had a retaliatory <u>motive</u>. *See Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092, 1100–01 (D. Minn. 2013), *aff'd,* 768 F.3d 786 (8th Cir. 2014). That protected activity was a contributing factor to an adverse employment action can be proven through circumstantial evidence of a temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, the falsity of the employer's explanation or a change in the employer's attitude toward plaintiff after he/she engaged in protected activity. *Id.* (citing *DeFRancesco v. Union RR Co.,* ARB No. 10–114, ALJ No.2009–FRS–0 (ARB Feb. 29, 2012)).

The critical inquiry in a pretext analysis "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017) (citing *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009)).

Defendant argues strongly that Plaintiff will be unable to show that BNSF's "dishonesty" finding resulting in termination was in any way pretextual. (Reply at 6–12.) Under these facts, however, the court disagrees. Reasonable jurors could indeed find under the undisputed facts that BNSF might have been simply searching for a way to rid itself of a recently-hired, short-term employee who already, with only seven to eight months of railroad employment under his

belt, was filing injury reports, taking sick leave, using medical benefits, and ruining the statistics for a "safe" work environment[11] that were proudly displayed by the company. (Resp. at 12.).

The undisputed facts are supportive of a finding that discriminatory animus was the motivating factor behind Plaintiff's termination after he filed an injury report and that the allegation of dishonesty, while a legitimate reason for termination if sustained, was pretextual in this case.[12] Whether or not BNSF had a good faith belief in its conclusion of dishonesty by Plaintiff is a disputed issue that must be decided by a jury. Judgment as a matter of law on these facts is inappropriate.

### 3. Affirmative Defense – Employer Action in the Absence of Protected Activity

Under the facts in this case, this section is inexorably tied to Section A.2 above. This is not a case where the employer finds out about some unrelated activity in the course of investigating an employee injury that would have, had it been learned in any other way, resulted in a disciplinary action against the employee totally removed from the employee's report of an injury. Here, the very injury is what the defendant claims was dishonest on the part of the plaintiff. As noted *supra*, Defendant does not argue or present evidence to support a claim that Plaintiff would have been terminated for a rule violation, namely failure to timely report a work injury because it did not seem serious enough *to the employee* to actually constitute a reportable injury.

---

[11] BNSF Supervisor Charles James confirmed there is a day counter at the Denver BNSF yard noting the number of employee injury-free days that is seen by all at work every day and employees do not want to be the individual to break the streak. (Resp., Ex. 7, pp. 107:6-24.)
[12] This is not to infer that the court agrees that BNSF discriminated against the Plaintiff but merely to explain that these are conclusions that belong to the jury, not to the court on summary judgment.

At trial, the defendant may attempt to prove that Plaintiff lied about his back injury in more ways than simply not timely reporting that in May 2015 he may have been injured. The evidence at this stage, for all the reasons set forth in Sections A.1 and 2 herein, however, is disputed, and the court has determined that these are issues that must be resolved by a jury. The same is true with respect to Defendant's affirmative defense.

### 4. Punitive Damages

FRSA provides that relief under the statute shall include "compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees" and "may include punitive damages in an amount not to exceed $250,000." 49 U.S.C.A. § 20109(e). It does not specify, however, the standard for awarding punitive damages.

The Supreme Court has looked to general common law principles—rather than the standard for awarding punitive damages adopted by any particular state—in determining FRSA punitive damages. *Smith v. Wade*, 461 U.S. 30, 56(1983). In *Smith*, the court said "[p]unitive damages are to be awarded only when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id. See also Worcester v. Springfield Terminal Ry. Co.*, 827 F.3d 179, 182 (1st Cir. 2016) (applying federal common law in FRSA case.) The Tenth Circuit has affirmed this interpretation in other contexts as well. *See Flitton v. Primary Residential Mortg., Inc.*, 238 F. App'x 410, 419 (10th Cir. 2007) (In the context of punitive damages under Title VII actions, punitive damages are appropriate only if a plaintiff proves that her employer engaged in intentional discrimination "with malice or with reckless indifference to the federally protected

rights of an aggrieved individual."); *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992)(punitive damages in §1983 action.)

The Department of Labor is the federal agency charged with administering FRSA. *See* 49 U.S.C. § 20109(d). Congress made clear that a primary purpose of FRSA was that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106. The DOL's Administrative Review Board has interpreted the FRSA standard for awarding punitive damages to be the same as the *Smith* standard. *Petersen v. Union Pac. R.R. Co.*, ARB Case No. 13–090, 2014 WL 6850019, at *3 (Nov. 20, 2014); *see also BNSF Ry. Co. v. U.S. Dept of Labor*, 816 F.3d 628, 642 (10th Cir. 2016).

In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999), the Supreme Court explained that "malice" or "reckless indifference" does not require "a showing of egregious or outrageous" conduct. Instead, a plaintiff must present proof that the employer acted "in the face of a perceived risk that its actions will violate federal law." *Id*. at 536.

Plaintiffs seeking punitive damages have a formidable burden. "[A]n award of punitive damages requires an assessment of [the defendant's] *subjective* state of mind." *Wulf v. City of Wichita*, 883 F.2d 842, 867 (10th Cir. 1989). The focus must be on whether the defendant's actions call for "deterrence and punishment over and above that provided by compensatory awards." *Smith*, 461 U.S. 30 at 54; *Jolivet*, 966 F.2d at 577.

Even if a plaintiff can show unlawful retaliation, BNSF "may avoid vicarious punitive damages liability by showing that it made good faith efforts to comply with [the FRSA]." *BNSF Ry. Co. v. United States Dep't of Labor Admin. Review Bd.*, 867 F.3d 942, 949 (8th Cir. 2017). BNSF has brought forth numerous documents attached to its Motion supporting its claim that

BNSF made good faith efforts to ensure compliance with the law. (Mot., Ex. HH, II, JJ, KK, LL.) These documents definitively show that Defendant understood its obligations under FRSA and in general issued directives to its employees. Plaintiff argues, however, that any determination of Defendant's state of mind and alleged willful discrimination deserving of deterrence and punishment can only be made after the evidence comes in at trial, in spite of – or perhaps in addition to – Defendant's multiple exhibits showing a knowledge of FRSA law and BNSF's obligations. Especially in light of the disputed issues addressed in the previous subsections of Section A herein, the good faith (or lack thereof) of BNSF cannot be decided as a matter of law.

Therefore, Defendant's Motion for Summary Judgment on Plaintiff's FRSA Claim must be denied.

## B. Federal Employers' Liability Act – Count I

The Federal Employers' Liability Act ("FELA"), holds railroads liable for employees' injuries "resulting in whole or in part from [carrier] negligence." 45 U.S.C. § 51. *See CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011). To establish a *prima facie* case under FELA, the plaintiff must prove that: (1) he was injured within the scope of his employment; (2) his employment was in furtherance of the railroad company's interstate transportation business; (3) that the railroad company was negligent; and (4) that the railroad company's negligence played some part in causing the injury for which the plaintiff seeks compensation under FELA. *Wright v. BNSF Ry. Co.*, 177 F. Supp. 3d 1310, 1314 (N.D. Okla. 2016). Within element number three is the implicit requirement that a plaintiff establish all of the elements of supporting a negligence finding in order to prevail on a FELA claim. *Standard v. Union Pac. R. Co.*, 34 F. App'x 629,

631 (10th Cir. 2002). Thus, a plaintiff carries the burden of demonstrating duty, breach, foreseeability, and causation. *Adams v. CSX Transp., Inc.*, 899 F.2d 536, 539 (6th Cir. 1990); *Wright*, 177 F. Supp. 3d at 1314. Defendant asserts that Plaintiff's FELA claim fails on elements 1, 3 and 4.

### 1.     Element 1, Scope of Employment/Employment Related Injury

The same analysis pertinent to Section A.1 *supra* applies to the analysis here. Plaintiff makes his allegations of employer negligence with respect to an injury that he alleges happened on July 22, 2015, when he was working with the stuck cushioning unit at BNSF's rip yard.. There are no allegations that the company was negligent with respect to any activity on or about May 23, 201,5 when Plaintiff was tying hand brakes at the yard. The issue of whether the injury, if any, actually happened on July 22, 2015 (or at some other time and place) is a material fact in dispute and must be decided by a jury. The court has found that the evidence at this stage would support Plaintiff's claim that the injury occurred on July 22, 2015.

### 2.     Element 3, Negligence

A railroad employer has a continuing non-delegable duty to use reasonable care to provide its employees a safe place to work. *Ackley v. Chicago and North Western Transp. Co.*, 820 F.2d 263, 267 (8th Cir. 1987) (citing *Bailey v. Central Vermont Ry.*, 319 U.S. 350, 352–353 (1943)). Under FELA, the negligence of the railroad employer may be determined by viewing its conduct as a whole. *Blair v. Baltimore Co.*, 323 U.S. 600, 604 (1945).

FELA imposes a higher standard of care beyond the general duty of reasonable care that the law requires of everyone. *Kernan v. American Dredging Co*., 355 U.S. 426 (1958). FELA does not, however, make an employer the insurer of the safety its employees while they are on

duty.  *Ellis v. Union Pacific R. Co.*, 329 U.S. 649, 653 (1947).  The basis of liability under the

FELA is negligence, not merely the fact that an injury occurred.  *Id*; *see also, Consolidated Rail*

*Corp. v. Gottshall*, 512 U.S. 532, 543 (1994) (employer negligence is a prerequisite to liability).

The proper inquiry under FELA is "whether the railroad exercised reasonable care in

creating a reasonably safe working environment, not whether that working environment could

have been safer.  *Darrough v. CSX Transp. Inc.*, 321 F.3d 674, 676 (7th Cir. 2013).  When other

tools, equipment, work methods, policies and/or procedures were available that would have

created a safer work environment and reduced the risk of an employee injury, however, the

availability of any safer alternatives becomes part of the facts and circumstances relevant for the

jury to consider when determining whether a railroad exercised reasonable care with regard to

the injury incident under FELA.  *See Logsdon v. BNSF Ry. Co*., 2017 WL 37001212, at *4 (D.

Neb. Aug. 25, 2017) (collecting cases).  In *Stone v. New York, C., & St. L. R. Co.*, 344 U.S. 407,

408 (1953), the Supreme Court held that evidence of alternative methods was helpful in

determining whether a reasonable and prudent employer would have required the plaintiff to use

the method that injured him for removing railroad ties as opposed to an alternative method for

removing stubborn ties.  The existence of alternative methods was part of "the situation to be

appraised in determining whether respondent was negligent."  *Stone*, 344 U.S. at 408.  In

*Honeycutt v. Wabash R. Co.*, 355 U.S. 424 (1958), the Supreme Court reinstated a verdict for a

repairman injured while using a rivet gun with an unprotected trigger, finding that the existence

of a safer type of rivet gun justified the jury's finding of negligence.

As part of the negligence inquiry, a FELA plaintiff also must show circumstances which

a reasonable person would foresee as creating harm.  *Gallick v. B & O R.R.*, 372 U.S. 108, 117

(1963). As the burden of proving that the workplace was unsafe rests with the Plaintiff, *Shea v. New York, New Haven and Hartford Railroad Co.*, 316 F.2d 838, 841 (1st Cir. 1963), "an employer is not liable if it had no reasonable way of knowing about the hazard that caused the employees' injury." *Peyton v. St. Louis Southwestern Ry. Co.*, 962 F.2d 832, 833–34 (8th Cir. 1992).

In *McBride*, the Supreme Court instructed

'Reasonable foreseeability of harm,' we clarified in *Gallick*, is indeed 'an essential ingredient of FELA negligence. 372 U.S. at 117. The jury, therefore, must be asked, initially: Did the carrier 'fai[l] to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances[?]' *Id*. at 118. In that regard, the jury may be told that '[the railroad's] duties are measured by what is reasonably foreseeable under like circumstances.' *Ibid*. Thus, '[i]f a person has no reasonable ground to anticipate that a particular condition … would or might result in a mishap and injury, then the party is not required to do anything to correct [the] condition.' *Id*. at 118, n. 7 quotation marks omitted). If negligence is proved, however, and is shown to have '*played any part, even the slightest, in producing the injury*," then the carrier is answerable in damages even if 'the extent of the [injury] or the manner in which it occurred' was not '[p]robable' or foreseeable.'

564 U.S. at 703 (internal citations omitted).

Plaintiff alleges the BNSF was negligent on July 22, 2015 because it failed to provide Plaintiff with a safe place to work, the proper and safe tools to do the work required of him, and proper supervision to do the work, that it failed to enforce its own safety rules applicable to the work tasks, that it violated one or more applicable statutory provisions promulgated by the Occupational Safety & Health Administration ("OSHA") with regard to the work place and tasks required, and that it violated one or more of the statutory provisions set forth in the applicable Code of Federal Regulations with respect to the environment and the tasks required of Plaintiff. (Compl. [Doc. No. 1] at ¶ 11.)

Defendant begins by quibbling about the actual procedure Plaintiff was performing on July 22, 2015 with the sledge hammer on the cushioning unit. Defendant alleges that the instructions provided by the manufacturer for removal of a cushioning unit state

> provide that removal of oil is only recommended if the cushioning unit is deemed to be tight in the sill pocket. *Id.* This requires the first-step of determining if the unit is tight, which is the task Smith was performing (tapping the unit with a sledgehammer to determine whether it was loose or tight) when he claims injury.

(Mot. at 32.) Plaintiff insists he was actually striking the head of the sledge hammer on the unit in a plunger-like movement to attempt to dislodge it from its seating. This "he said/she said" disagreement is classic jury fodder and critical to a determination about whether Plaintiff was performing a safe task by use of a safe methodology.

Plaintiff alleges that the cushioning unit he was working on should have been drained of oil/nitrogen so as to release it safely instead of requiring him to pound on the coupling and attempt to manually loosen the fitting. Plaintiff states that that had he and his colleagues drained the unit, the pressure inside the cushioning unit would have been released thereby allowing it to be removed easily from underneath the rail car. (Resp at 2.) Therefore, because he was told the wrong way to perform his task by his senior colleagues, the job he was performing was rendered unsafe. Defendant presents contradictory evidence from Derek Hawley (whose provenance is unknown to the court) who, when considering the drainage of the oil from the cushioning unit, was asked, "Does the less oil within the cushioning unit device itself impact the ease with which the metal rod goes in and out of the cushioning unit itself?" and responded, "When you drain the oil, there's still enough pressure on that that it stays in its position, it does not retract all the way, if that's what you're asking." (Mot., Ex. N [Doc. No. 48–11] deposition page 46.) Whether

draining the oil/nitrogen from the unit would have sufficiently loosened the fitting to allow easy removal, thus alleviating the dangerous condition, is a disputed issue of material fact.

Plaintiff also alleges negligence because of a violation of BNSF's policy to have new cushioning units in stock on property for all of the various types of rail cars a Carman would be required to repair. (Resp., Ex. 7, Dep. of Charles Jerry James, BNSF supervisor [Doc. No. 56–7] at Dep. page 96:17–97:20.) If a new unit had been in stock, Plaintiff alleges he would not have had to attempt to force the coupling apart with the sledge hammer without draining the oil/nitrogen.[13] However, contrary to policy, on July 22, 2015, Plaintiff claims that no new units were in stock and therefore the Carman employees were attempting to remove the old, stuck unit without draining the oil/nitrogen as recommended by the manufacturer so that this cushioning unit could be reused.

Defendant again presents contradictory evidence that suggests there was a new cushioning unit at the RIP on July 22, 2015. BNSF's Rule 30(b)(6) deponent Andrew Simpson testified from documents which he said showed that on July 22, 2015, a new cushioning unit was installed on the rail car (presumably by the crew that came on the job subsequent to Plaintiff's ending his shift). (Mot., Ex. N [Doc. No. 48–14] at 42.) The cushioning unit upon which Plaintiff was working was later denoted as "defective." (Mot., Ex. MM.) The court finds that at best this is a disputed issue of fact which requires further exploration before being definitive.

According to the plaintiff, the list of potential negligent actions by BNSF goes on. Plaintiff alleges that had the employees been allowed to drain the oil/nitrogen from the cushioning unit, there was a tool available to accomplish the task available to them, but because

---

[13] Once drained of the oil/nitrogen the cushioning unit was rendered unfit for further use.

they were forced to try to save the unit, they could not use that tool.  (Resp. at 2.)  Plaintiff claims the Job Safety Analysis pertaining to removal of a cushioning unit is different in Nebraska from Denver, Colorado, and that Denver employees are therefore not sufficiently warned of the safety issues associated with replacement of a cushioning unit.  (*Id*. at 2–3.)  Plaintiff also claims that training was completely lacking as to the manufacturer's recommendations and directions about safely removing a cushioning unit on a rail car.  (*Id*. at 3.)  Plaintiff further alleges that he was wrongfully directed to use a sledge hammer to help loosen the cushioning unit and that he should have been trained and counseled by the senior Carman employees to follow the manufacturer's instructions to first bleed off the nitrogen and then use a pry bar on the unit, not a sledge hammer.  (*Id*. at 3–5.)

Many of these issues and allegations are intertwined and the court has no doubt that Defendant could meet many, if not all, with contradictory evidence.  However, that is the very point of a trial.  The Supreme Court, for the last 76 years after deciding *Bailey,* 319 U.S. at 353–54, has not altered its position that facts underlying a negligence claim are considerations for a jury, not the court, to make.  As the court stated in *Bailey*

> The nature of the task which [Plaintiff] undertook, the hazards which it entailed, the effort which it required, the kind of footing he had, the space in which he could stand, the absence of a guard rail, the height of the bridge above the ground, the fact that the car could have been opened or unloaded near the bridge on level ground—all these were facts and circumstances for the jury to weigh and appraise in determining whether respondent in furnishing [Plaintiff] with that particular place in which to perform the task was negligent.  The debatable quality of that issue, the fact that fair-minded men might reach different conclusions, emphasize the appropriateness of leaving the question to the jury.  The jury is the tribunal under our legal system to decide that type of issue as well as issues involving controverted evidence.  To withdraw such a question from the jury is to usurp its functions.

*Id.* (internal citations omitted).

Defendant argues, however, that the issues in this case involve the unique responsibilities of a Carman in a rail carrier's workplace that are not within the kin of an average juror and therefore Plaintiff cannot prove negligence without a standard of care expert witness. As the Plaintiff has not designated such an expert, Defendant argues the court must find in favor of Defendant on negligence. Plaintiff disputes the need for an expert witness in this regard. *Cf. Caniff v. CSX Transp., Inc.*, 438 S.W.3d 368, 373–74 (Ky. 2014) (*undisputed* need for an expert witness).

The standard for submitting a FELA case to the jury is significantly less stringent than in the ordinary negligence action. *Rogers v. Missouri Pacific R. Co.,* 352 U.S. 500, 506 (1957). Under the FELA, "the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence *played any part, even the slightest*, in producing the injury or death for which damages are sought." *McBride*, 564 U.S. at 692 (emphasis added) (quotation omitted); *Pehowic v. Erie Lackawana. Railroad Co*., 430 F.2d 697, 699–700 (3rd Cir. 1970) (a trial court is justified in withdrawing such issues from the jury's consideration only in those extremely rare instances where there is a zero probability either of employer negligence or that any such negligence contributed to the injury of an employee). In a FELA case, a plaintiff is required "to present more than a scintilla of evidence in order to create a jury question on the issue of employer liability, but not much more." *Aparicio v. Norfolk & W. Ry. Co.,* 84 F.3d 803, 810 (6th Cir. 1996), *abrogated on other grounds*. As put more colorfully by the Seventh Circuit, numerous cases have affirmed submission of FELA claims to juries based on evidence "scarcely more substantial than pigeon bone broth." *Green v. CSX*, 414 F.3d 758, 766 (7th Cir. 2005) (quoting *Habin v. Burlington Northern Railroad Co.*, 921 F.2d 129, 132 (7th Cir. 1990)).

Expert testimony is not needed in most FELA negligence cases. Jurors are generally entitled to draw their own inferences from the evidence. *Fontenot v. Teledyne Movible Offshore, Inc.,* 714 F.2d 17, 20 (5th Cir. 1983). "Jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded on evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn." *Id.* (quoting *Schulz v. Penn. R.R. Co.,* 350 U.S. 523, 527, (1956)). *See also McBride,* 564 U.S. at 704 (Courts rely on juror common sense to reduce the risk of exorbitant liability in FELA actions.); *Huffman v. Union Pac. R.R.,* 675 F.3d 412, 419 (5th Cir. 2012).

The court therefore finds that summary judgment is not the appropriate remedy for what is essentially a procedural question regarding the need or advisability of calling an expert witness. At this stage, the evidence is sufficient to allow a jury to find negligence, even in the absence of expert testimony.

### 3. Element 4, Causation

FELA's causation standard is "relaxed" compared to that applicable in common-law tort litigation. The Supreme Court has described that relaxed standard as "whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." *Rogers*, 352 U.S. at 506–508; *Thornton v. Atchison, Topeka & Santa Fe Ry. Co.*, 11 F. Supp. 2d 1311, 1312 (D.N.M. 1997); *McBride*, 564 U.S. 685 at 692.

The court must also keep in mind the Supreme Court's counsel that

[t]he right to trial by jury is a basic and fundamental feature of our system of federal jurisprudence. It is part and parcel of the remedy afforded railroad workers under the Employers' Liability Act. Reasonable care and cause and effect are as elusive here as in other fields. But the jury has been chosen as the appropriate tribunal to

apply those standards to the facts of these personal injuries. That method of determining the liability of the carriers and of placing on them the cost of these industrial accidents may be crude, archaic, and expensive as compared with the more modern systems of workmen's compensation. But however inefficient and backward it may be, it is the system which Congress has provided. To deprive these workers of the benefit of a jury trial in close or doubtful cases is to take away a goodly portion of the relief which Congress has afforded them.

*Bailey*, 319 U.S. at 353–54 (internal quotations omitted). *See also Clements v. Norfolk S. Ry. Co.*, No. 5:11–CV–322 HL, 2012 WL 5471947, at *7 (M.D. Ga. Nov. 9, 2012).

In this case, Plaintiff saw two medical providers during the several month time period encompassing May to July, 2015. Plaintiff presented his symptoms to the providers and sought and received medical treatment. Additionally, Plaintiff has had an MRI and surgery on his spine. There is ample medical evidence about Plaintiff's back condition. While the court has disallowed testimony from either Dr. Reedy or Dr. Kutcher to the effect that something Plaintiff did in connection with his workplace actually caused the injury, they are not precluded from testimony concerning what they saw, heard or discerned from their treatment of Plaintiff at that time. The jury will be able to utilize information from the presentation of the case as a whole to determine causation. *See e.g. Gutierrez v. Excel Corp.,* 106 F.3d 683, 686 n.3 (5th Cir. 1997) (where theory of negligence was that an electric knife used by assembly line workers was known to cause cumulative trauma disorders and the defendants failed to adopt safety measures to reduce the trauma, court allowed a jury in a negligence action to infer causation even without expert witnesses).

It is generally the jury's role to determine whether a railroad has breached its duties under the FELA. *Rogers,* 352 U.S. at 506–507. It should be only "the infrequent cases where fair-

minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury" where summary judgment would be an appropriate remedy. *Id.* at 510.

This case represents many "close" issues. While it is not a certainty that Plaintiff will be successful at trial, under the lenient standards applicable to a FELA case and the stringent standards Congress intended to impose against rail companies with respect to FRSA claims, the court cannot find for Defendant as a matter of law. To do so would require the court to make impermissible credibility determinations and also resolve disputed factual issues. Thus, Defendant's Motion for Summary Judgment must be denied.

WHEREFORE, it is

**ORDERED** that "BNSF Railway Company's Motion for Summary Judgment on Plaintiff's FELA and FRSA Claims" [Doc. No. 48] is **DENIED**. It is further

**ORDERED** that, no later than **July 22, 2019**, the parties shall initiate a conference call and call chambers, 719-575-0328, to set a Final Pretrial/Trial Preparation Conference and Jury Trial.

Dated this 18th day of July, 2019.

BY THE COURT:

_____
Kathleen M. Tafoya
United States Magistrate Judge